**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | | |
|---|---|---|
| United States of America, | ) | No. CV05-00363-PHX-NVW |
| | ) | |
| Plaintiff, | ) | **ORDER** |
| | ) | |
| vs. | ) | |
| | ) | |
| 10.082 Acres of Land, more or less, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |

On January 31, 2005, the United States took 10.082 acres of land from Defendant Hoffmann Rentals by eminent domain.  U.S. Const. amend. V.  The landowners will be compensated by a jury in a condemnation proceeding governed by Fed. R. Civ. P. 71A, which is scheduled to begin on April 17, 2007.  The jury will hear evidence from two appraisers.

The landowners' expert is Jim Sanders, an Arizona Certified General Real Estate Appraiser.  Mr. Sanders concluded that Defendants' property had three different highest and best uses at the time of the taking–owner/user warehousing, contractor yard, and light industrial retail–and that the combined market value of the 10.082 acres was $1,023,000 as of January 31, 2005, the valuation date. (Sanders Appraisal, 5.)  Kim Johnson, an Accredited Rural Appraiser hired by the United States, concluded that the property had but one highest and best use, investment, and that the property was worth only $570,000 at the time of the taking. (Johnson Appraisal, 4.)  The $453,000 difference between the two estimates results

1   from variations in the appraisers' selection of comparable sales, differing conclusions about
2   the property's highest and best uses, and Mr. Sanders' assumption that, but for the taking,
3   some of Defendants' land would have been developed into industrial property in the
4   reasonably near future.

5       Plaintiff's Motions in Limine assail Mr. Sanders' appraisal on three grounds.  First,
6   Plaintiff moves to exclude evidence of sales and listings of properties that are not comparable
7   to the subject property because of differences in  marketability and location,  and because
8   these transactions and offers to sell occurred well after January 31, 2005, the date of the
9   taking.  (Doc. # 57.)  In its second Motion, Plaintiff seeks to exclude evidence of pre-
10  condemnation announcements when used to show that "project influence" artificially
11  depressed the market for industrial properties in the affected area prior to the taking.  (Doc.
12  # 58.)  The third Motion in Limine challenges Mr. Sanders' contention that the condemned
13  property has three separate highest and best uses with differing market values that may be
14  added together to reach a commutative valuation as of January 31, 2005.  (Doc. # 59.)  These
15  Motions are worthy of relief.

16  **I.    Background**

17      Defendants Greg and Yira Hoffmann purchased 10.082 acres of land located at 2598
18  East County 14th Street in Yuma County, Arizona ("the subject property") in fee on
19  December 23, 1997.[1]  (Johnson App 10.)  The land is located outside the Yuma city limits,
20  approximately two miles southeast of the Yuma International Airport and the United States
21  Marine Corps Air Station.  At the time of the sale, the subject property was planted with
22  grapefruit trees and zoned as Rural Area 10 (RA-10), an agricultural designation.  (Hoffmann
23  Dep. 34:4-34:9, Nov. 9, 2006; Johnson App. 18.)

24      On December 8, 1998, the Hoffmanns received a letter from the Department of the
25  Navy notifying them of a proposal to expand the Marine Corps Air Station to accommodate

26

27      [1]The Yuma County records indicate that the subject property is 9.42 acres rather than
    10.082 acres in size.  This discrepancy is explained by the County's policy of "netting out"
28  roads when determining parcel size.  (Johnson App. 20.)

1  additional munitions bunkers. (Defs.' Resp. to Pl.'s Interrog. 8-9; Doc. # 57 at 2.)
2  Neighboring landowners learned of the proposed Air Station expansion several years earlier.
3  (Doc. # 58 Ex. C.) The Marine Corps sought to use Defendants' land to store a full year's
4  supply of military ordnance. (Doc. # 39 at 2.) The United States first proposed to extend the
5  Air Base south of the airport to County 15th Street, between Avenue 3E and Avenue A.
6  (Doc. # 62 at 2.) By 1999, however, the southern boundary of the project was fixed at
7  County 14th Street, with Avenues 3E and A continuing to mark the eastern and western
8  boundaries of the project. (*Id.*) Under either proposal, the project plainly encompassed
9  Defendants' land. The Hoffmanns began to improve the subject property only after they
10 received notice of the proposed Air Base expansion.

11        First, in March 1999, Greg and Yira Hoffmann transferred title to the subject property
12 to Defendant Hoffmann Rentals, Inc., an entity controlled by them. (Johnson App. 10.) In
13 the fall of 1999, the landowners won approval from the Yuma County Board of Supervisors
14 to change the zoning on the property from RA-10 to light industrial, a designation that
15 permits, among other things, low-intensity retail use. (Doc. # 60 at 3; Johnson App. 18, 30.)
16 As part of the change in zoning, the Hoffmanns subdivided the subject property into five
17 approximately two-acre parcels. (Sanders Dep. 45:15-23.) The Hoffmann Parcel Map, filed
18 with the Yuma County Recorder, demonstrates that Parcels B and E have direct access to
19 County 14th Street, which Defendants characterize as the best uninterrupted east-west
20 thoroughfare in Yuma County, while Parcels A, C and D front unimproved roads. (Doc. #
21 58 Ex. F; Defs.' Resp. to Pl.'s Interrog. 8.)

22        Finally, in 2000, the Hoffmanns removed the citrus trees from all five parcels of the
23 subdivided property, and erected a workshop, an office, and a manufactured home on Parcel
24 A, where the Hoffmanns temporarily resided. (Doc. # 60 at 3.) Parcel A accesses County
25 14th Street by way of an easement recorded on Parcel B. (Hoffmann Dep. 46:14-20.)
26 Electricity and telephone services are available along the eastern property line of Parcel A.
27 (*Id.* at 44:1-2.) Hoffmann constructed an "over-sized well and septic system" on Parcel A
28 to service the buildings on that Parcel as well as future improvements on the "other four

1  parcels." (Doc. # 60 at 3; Hoffmann Dep. 44:1-46:15.)  No further improvements were made
2  to any of the five parcels prior to the January 31, 2005 taking.

3       The Air Station expansion was finally approved in February 2000.  On January 31,
4  2005, the United States filed a Declaration of Taking, Complaint in Condemnation, and
5  Notice of Condemnation to acquire Defendants' property in fee, together with its basic
6  appurtenant water rights, subject to existing easements for public roads and highways, public
7  utilities, railroads and pipelines.  (Doc. # 39 at 2.)

8  **II.**    **Principles of Law**

9       **A.**    **The Just Compensation Clause of the Fifth Amendment**

10       The Fifth Amendment of the United States Constitution provides that no "private
11  property [shall] be taken for public use, without just compensation."  "Just compensation
12  means a compensation that would be just in regard to the public, as well as in regard to the
13  individual." *Bauman v. Ross*., 167 U.S. 548, 570 (1897).  The Just Compensation Clause
14  requires that a dispossessed owner be "put in as good a position pecuniarily as if his property
15  had not been taken.  He must be made whole but is not entitled to more." *Olson v. United*
16  *States*, 292 U.S. 246, 255 (1934).

17       To be just, compensation usually must be at least equal to the "market value" of the
18  property at the time of the taking. *United States v. Miller*, 317 U.S. 369, 374 (1943).  Market
19  value means "what a willing buyer would pay in cash to a willing seller," *id*., taking into
20  consideration "[t]he highest and most profitable use for which the property is adaptable and
21  needed or likely to be needed in the reasonably near future . . . to the full extent that the
22  prospect of demand for such use affects the market value while the property is privately
23  held." *Olson*, 292 U.S. at 255 (citation omitted).

24       The burden rests upon the condemnees to establish by competent evidence their right
25  to compensation. *United States v. 25.02 Acres of Land*, 495 F.2d 1398, 1400-01 (10th Cir.
26  1974).

27

28

1

**B.      Admissibility of Evidence in a Condemnation Proceeding**

2      The distribution of responsibilities between the judge and jury in an eminent domain

3   proceeding is governed by Fed. R. Civ. P. 71A(h).  Under that Rule, a jury determines just

4   compensation, while "[t]rial of all issues shall otherwise be by the court."  "It follows that

5   it is for the judge to tell the jury the criteria it must follow [and the evidence it may consider]

6   in determining what amount will constitute just compensation."  *United States v. Reynolds*,

7   397 U.S. 14, 21 (1970).

8      "All facts which would influence a person of ordinary prudence, desiring to purchase

9   the property, are admissible" to prove market value,  *United States v. 100 Acres of Land*, 468

10   F.2d 1261, 1267 (9th Cir. 1972), "the only condition being that . . . willing vendees and

11   vendors would deem such evidence or information relevant in their negotiations."  *United*

12   *States v. 57.09 Acres of Land*, 757 F.2d 1025, 1027-28 (9th Cir. 1985) (citation and internal

13   quotations omitted) *see Cade v. United States*, 213 F.2d 138, 141 (4th Cir. 1954) ("It is

14   difficult to perceive why testimony, which experience has taught is generally found to be

15   safely relied upon by men in their important business affairs outside, should be rejected

16   inside the courthouse.") (citation omitted).

17      Evidence as to the reasonable probabilities of . . . prospective uses" of the condemned

18   land is admissible.  *100 Acres of Land*, 468 F.2d at 1267-68 (citations omitted).  Although

19   inherently speculative, such evidence is considered when ascertaining market value because

20   a "hypothetical buyer will purchase land with an eye to not only its existing use but to other

21   potential uses as well." *United States v. 320.0 Acres of Land*, 605 F.2d 762, 781 (5th Cir.

22   1979).  For example, "If land is so situated that it is actually available for building purposes,

23   its value for such purposes may be considered, even if it is used as a farm or is covered with

24   brush and boulders." 4-12B Nichols on Eminent Domain § 12B.14 (3d ed. 1987) (hereinafter

25   "Nichols").  The landowners must satisfy a pretrial burden before their proposed highest and

26   best uses may be submitted to a jury empaneled under Fed. R. Civ. P. 71A.

27      The landowner must show, by a preponderance of the evidence, that the jury could

28   reasonably conclude that the land is physically adaptable to the proposed use, and also that

there is a need or demand for such use either in fact, at the time of the taking, or in the reasonably near future. *United States v. 27.93 Acres of Land*, 924 F.2d 506, 512-13 (3d Cir. 1991). Proof of physical adaptability alone is not sufficient, as there must also be more than a mere theoretical demand for the proposed use. *Olson*, 292 U.S. at 256; *341.45 Acres of Land*, 633 F.2d at 113; *see* Appraisal Inst., Unif. Appraisal Standards for Fed. Land Acquisitions 33 (2000). "The trial judge's screening of the evidence does not require an extensive and detailed review of all the evidence. Rather, the judge need only find that there is credible evidence" of the proposed highest and best use. *United States v. 341.45 Acres of Land*, 633 F.2d 108, 111 (8th Cir. 1980).

If the probative value of relevant market evidence is "substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury," the court may exclude it. Fed. R. Evid. 403. This is a matter of evidentiary sufficiency. "Elements affecting value that depend upon events or combinations of occurrences which, while within the realm of possibility, are not fairly shown to be reasonably probable, should be excluded from consideration, for that would be to allow mere speculation and conjecture to become a guide for the ascertainment of value–a thing to be condemned in business transactions as well as in judicial ascertainment of truth." *Olson*, 292 U.S. at 257.

Once admitted, "[t]he weight to be given evidence of reasonable probability," and "whether adaptability and probability affect market value," are questions of fact to resolved by the jury. *100 Acres of Land*, 468 F.2d at 1267-68 ("It is not uncommon for expert witnesses to disagree in regard to the highest and best use to which condemned property may be put and as to values based on their respective opinions.").

## C.   Appraisal Methodology

The Court of Appeals for the Ninth Circuit recognizes three appraisal methods in ascertaining market value: (1) actual sales of comparable property at about the time of the taking, the most reliable and therefore the preferred valuation method; (2) income or capitalization of income; and (3) the reproduction cost at the time of the taking, less depreciation. *United States v. 99.66 Acres of Land*, 970 F.2d 651, 655 (9th Cir. 1992). A

1  fourth method, called the "lot method," is occasionally allowed where "no comparable sales

2  exist and facts show that a market for individual lot sales is not speculative." *Id.*

3  **III.    Motion to Exclude Sales and Listings after the Date of Valuation**

4          The United States urges the court to exclude the majority of Defendants' comparable

5  sales evidence, arguing that "admitting sales significantly after the date of valuation, not in

6  proximity to the subject property, and significantly smaller than the 9.42 acres appraised by

7  Mr. Sanders would be speculative."  (Doc. # 57 at 5.)  The Motion is well taken.  Mr.

8  Sanders' appraisal relies, without sufficient justification, upon temporally remote transactions

9  involving dissimilar properties located far afield from the subject property.  The probative

10  value of the comparable sales evidence proffered by Defendants' appraiser as to the market

11  value of the condemned property on the valuation date is substantially outweighed by its

12  prejudicial, confusing and misleading effect.  Sales of dissimilar properties, contracts for the

13  sale of comparable properties executed after June 30, 2005, and mere offers to sell will be

14  excluded from the landowners' appraisal.

15          **A.    Comparable Sales as Evidence of Market Value**

16          Comparable sales are the best evidence of market value.  *99.66 Acres of Land*, 970

17  F.2d at 655; *see Baetjer v. United States*, 143 F.2d 391, 397 (1st Cir. 1944)  ("What

18  comparable land changes hands for on the market at about the time of taking is usually the

19  best evidence of market value available. In the absence of such evidence a determination of

20  value becomes at best only a guess by informed persons.") As the Supreme Court observed

21  in *Kimball Laundry Co. v. United States*, 338 U.S. 1, 12 (U.S. 1949), "If exchanges of similar

22  property have been frequent, the inference is strong that the equivalent arrived at by the

23  haggling of the market would probably have been offered and accepted, and it is thus that the

24  'market price' becomes so important a standard of reference."  "If sufficient similarities

25  existed between the condemned tract and the properties sought to be used as comparable, .

26  . . the jury [must be allowed] to determine for itself whether the described properties were

27  in fact comparable to the condemned tract, and if found comparable, what weight should be

28  given thereto." *United States v. 84.4 Acres of Land*, 348 F.2d 117, 119 (3d Cir. 1965).

"[C]omparability is a function of three variables: the respective characteristics of the properties, their geographic proximity to each other, and the closeness in time of the sales." *United States v. 68.94 Acres of Land*, 918 F.2d 389, 399 (3d Cir. 1990); Unif. Appraisal Standards 47 (specifying nine "basic elements of comparison": property rights conveyed; financing terms; conditions of sale; market conditions; location; physical characteristics; economic characteristics; use and zoning; and non-realty components of value included in the sale property).

The court's authority under Fed. R. Civ. P. 71A(h) to exclude evidence of sales of dissimilar properties is affirmed with regularity.  "The questions of whether [comparable sales] transactions are near enough in time, or involve substantially similar lands, or significant amounts of land are all questions of the remoteness of the evidence offered and in consequence are for the trial court."  *Baetjer*, 143 F.2d at 397.  Since no two pieces of land are ever exactly alike, "parcels may only be compared where the dissimilarities are reduced to a minimum and allowance made for such dissimilarities. 4-12B Nichols § 12B.04 (noting the "danger of diverting the minds of the jury from the real issue by their consideration of . . . collateral points, of the unnecessary waste of time by the introduction of such evidence in court, and a possibility of the jury being misled by testimony of the sale of land the resemblance of which to the land in issue is more specious than real").

## B.    Dissimilar Sales Excluded

Mr. Sanders compares the 10.082 acres of mostly unimproved agricultural land to lots within the Curtis Industrial Park Phase II, as well as to sales of other Yuma warehouses located at 2226 East 15th Place; 2530 East 15th Place; 2732 S. Avenue 3E; and 2885 East 12th Street  throughout his appraisal. (Sanders App. 43, 47, 49.)  These properties were sold directly to light industrial users.  The lots are significantly smaller than the subject property which, though subdivided on paper by its owners, must be valued as a single ten acre tract for the reasons set forth in Part V below.  The industrial properties are geographically dissimilar as well, being located in an urban environment in close proximity to major highways and other business infrastructure.   The Curtis properties, for example, are

approximately two acres or less in size and are located within the Yuma city limits in a developed industrial park close to Interstate 8 and a railroad. (*Id*. at 16.)  The favorable location of these industrial properties commands a market premium that the subject property, which is in a predominantly agricultural area, fronts a rural arterial, and lacks most infrastructure, cannot.  Mr. Sanders contends that these differences may be ignored or alternatively that they may be adjusted for. (*Id*. at 39.) There is no basis, however, to rely on patently remote transactions when more comparable sales are available. *Cf. United States v. 100.80 Acres of Land*, 657 F.Supp. 269, 274 n.7 (M.D.N.C. 1987) ("The record supports that the [subject property] is unique in its location and relation to the market, and therefore, that no comparable sales exist.")

There is no paucity of comparable sales here.  In fact, Plaintiff's appraiser identified no fewer than six properties sold prior to the taking whose similarity in size and location made them amenable to direct comparison to Defendants' land. (Johnson App. 34-37.) The neighborhood along the south side of County 14th Street between Avenues 3E and A is ripe for comparison because it is not within the scope of the Air Base expansion project and is nearly identical to the subject property. But Mr. Sanders' appraisal excludes, with few exceptions, all sales from the subject neighborhood in favor of more remote comparables from the Curtis Industrial Park and other locations.  The rationale for this sweeping exclusion–project influence–is not supported by sufficient evidence, as will be discussed below. Therefore, the Curtis lots as well as the properties located at 2226 East 15th Place; 2530 East 15th Place; 2732 S. Avenue 3E; and  2885 East 12th Street will be excluded from the condemnation proceeding.

The landowners contend that the dissimilar warehouse properties are admissible to the extent they are used to "study market trends, relationships between market forces, and to support the manner and extent of adjustments between the price of comparable sales relative to the Subject Property." (Doc. # 61 at 3.) Defendants further urge that the Curtis properties are admissible to support Mr. Sanders' conclusion that "sales at the end of 2004 were probably under-priced," and to "isolate when much of the appreciation in price for

comparable improved properties occurred." (*Id*. at 4-5.) Mr. Sanders' appraisal is grounded in speculation to the extent it relies on such sales. Whether used in a "supporting role" or as direct comparables, the dissimilar sales from the Curtis Industrial Park and other remote areas must be excluded from the condemnation proceeding. (*Id*.) Their minimal probative value is substantially outweighed by the danger of jury prejudice and confusion.

Mr. Sanders relied on warehouse properties in the Curtis Industrial Park and in Tucson to estimate depreciation on Parcel A's improvements. (Sanders App. 33-35.) The Government's appraiser also appears to have relied on data from remote locations to calculate the present value of the home, office, and warehouse on that parcel. (Johnson App. 48.) Mr. Sanders may use data from the Curtis Industrial Park and the Tucson area to estimate depreciation on Parcel A's improvements, but he may not use these remote data to value the land or for any other purpose.

### C. Sales of Similar Properties Executed More Than Five Months After the Taking Are Excluded

Some of Mr. Sanders' sales would be excluded even if they were comparable to the subject property, which they are not. A dramatic increase in Yuma land values began in spring 2005. (Doc. # 57 at 3.) Willing buyers and sellers interacted in a profoundly different market environment beginning at that time. As the Government correctly points out, "this increase could not have been known to a willing buyer and a willing seller in January of 2005." (*Id*.) Comparable sales occurring between February 1, 2005, and June 30, 2005, such as Dr. Laura Milliken's June 1, 2005 purchase of acreage directly across the street from the subject property, are admissible to prove market value provided that they are time-adjusted. However, sales of even the most comparable properties must be categorically excluded if entered into after June 30, 2005, as the risk of jury prejudice and confusion becomes unacceptably high due to market transformation. This termination point is generous to the landowners.

1

**D.      No Inference of Demand from Inadmissible Evidence**

2      Mr. Sanders opines that there is "continued high demand for industrial properties and

3 low intensity warehouse/retail properties" in the subject neighborhood.  (Sanders App. 17-

4 18.) Mr. Sanders infers this demand from several geographically and temporally remote land

5 sales, as well as from mere offers to sell property for light industrial and retail use.  To the

6 extent used to support a January 31, 2005 valuation for the subject property, this inference

7 is unsupported by admissible evidence and must be excluded.

8      Federal common law provides the rule of decision here.  Before a proposed use may

9 be submitted to the jury, the landowners must first present credible evidence, not only that

10 their land is physically adaptable to light industrial use, but also that there is a reasonably

11 probable need or demand for that optimal use in the reasonably near future.  *27.93 Acres of*

12 *Land*, 924 F.2d at 512-13.  Defendants have proven physical adaptability by showing that

13 they 1) subdivided the subject property into five parcels and recorded the land plat with the

14 Yuma County Recorder; 2) re-zoned the subject property for light industrial use; 3) removed

15 the citrus trees from all five parcels; 4) improved Parcel A with a workshop, an office and

16 a manufactured home; 5) brought electricity to Parcel A; and 6) constructed an "over-sized

17 well and septic system" on Parcel A that the landowners allege "was designed to service the

18 other four parcels."  (Doc. # 60 at 3; Hoffmann Dep. 44:1-46:15.)   Defendants have not,

19 however, shown the necessary quantum of demand

20      The "Supply/Demand" section of Mr. Sanders' appraisal lists three completed land

21 transactions in support of the proposed optimal use. (Sanders App. 17-18.)  Two parcels of

22 land located directly across the street from the subject property were sold for retail use on

23 June 1, 2005, and August 26, 2005, respectively.  (*Id*. at 17-18.)  The first of these

24 transactions, though significantly smaller than the subject property and occurring some time

25 after the taking, is admissible with appropriate adjustments to prove demand for Mr. Sanders'

26 proposed optimal use.  Neither the August 26, 2005 transaction nor the warehouse property

27 located at 2732 South Avenue 3E are admissible to prove demand because, as discussed

28 above, they are not comparable sales.  It would be highly speculative to infer demand from

1    transactions executed more than five months after the taking in a materially different market
2    environment, or from the sale of dissimilar properties.  [T]here must be some evidence that
3    others have developed and sold such lots, so as to establish a trend, at least, towards that type
4    of development."  *341.45 Acres of Land*, 633 F.2d at 112.

5         Demand is also inferred from four offers to sell similar land in the subject
6    neighborhood.  This evidence consists of 1) a five acre parcel not zoned for light industrial
7    use but offered for sale by its owner for that use; 2) a listing of a 6.78 acre parcel fronting
8    Avenue 3E potentially suited for conversion to light industrial use, and 3) two listings on the
9    southeast corner of Avenue 3E and County 13th for property that zoned residential and
10   therefore *not* available for the use proposed by the landowners. (Sanders App. 17-18.)  Mr.
11   Sanders' discussion of these four listings includes the price the owners of the parcels are
12   asking for their land.  These offers are insufficient to support an inference of reasonably
13   proximate demand for "low intensity warehouse/retail" use, whether viewed alone or in
14   conjunction with the sale of the parcels directly across the street from the subject property.

15        The landowners note that Mr. Sanders does not use these listings to prove market
16   value directly.  (Doc. # 61 at 4.)  While the contract price of comparable land is directly
17   admissible to prove market value, offers to sell or purchase property are plainly inadmissible
18   for that purpose.  *United States v. 10,031.98 Acres of Land*, 850 F.2d 634, 637 (10th Cir.
19   1988). "[E]vidence of the price for which someone might be willing to sell such a similar
20   property or how much he may have refused to take for it would not tend to prove the market
21   value of the property taken," but would rather result in "confusion over collateral issues and
22   invite the admission of hearsay evidence."  5-21 Nichols § 21.03 (internal quotations and
23   citations omitted).  However, the same concerns that militate against the admission of
24   property listings to prove market value apply with equal force to the necessary predicate of
25   that conclusion: highest and best use.  The presumption that the highest and best use of the
26   subject property is its use on the valuation date–vacant land held for speculation–cannot be
27   rebutted with property listings and hearsay declarations of neighboring property owners.

28

1    Mr. Sanders uses the listings to suggest by extrapolation that there was strong demand

2    as of the valuation date for light industrial retail property in the predominantly agricultural

3    south of the Yuma airport, an area along County 14th Street not serviced by city utilities,

4    interstate highways, or railroads. The appraiser is entitled, indeed he is obliged, to consider

5    relevant listings in the subject neighborhood when forming his opinion of market value.

6    Unif. Appraisal Standards 59.  But credible, nonspeculative evidence of demand is required

7    before Mr. Sanders' conclusions may be submitted to a jury empaneled under Fed. R. Civ.

8    71A.  Where, as here, comparable sales are available to prove land value, demand for a

9    proposed use must be shown by reference to those sales.  "To credibly establish demand" for

10   a proposed use, "more than a few sporadic *sales*" of similarly situated properties "are

11   necessary." *United States v. 158.24 Acres of Land*, 696 F.2d 563 (8th Cir. 1982) (emphasis

12   added).  There is only one completed transaction to support Mr. Sanders' opinion of demand.

13   This sale would not allow a jury to reasonably conclude that there was a need or demand for

14   the proposed use either at the time of the taking, or in the reasonably near future.

15       Mr. Sanders' opinion as to the value of the subject parcel is predicated upon his

16   conclusion that portions of the land would likely have been converted to light industrial use.

17   Although there was and continues to be an abundant oversupply of vacant land zoned for

18   light industrial use in that neighborhood, Mr. Sanders contends that a willing buyer would

19   likely have selected the landowners' property over all their competitors for conversion to

20   retail use on January 31, 2005.  This conclusion is supported by only one sale from the

21   subject neighborhood. Other than that isolated transaction, Mr. Sanders' opinion is premised

22   entirely on sales of remote properties and mere offers to sell comparable properties in the

23   subject neighborhood.  Mr. Sanders' opinion as to the highest and best use of the tract,

24   having necessarily been based to a large extent on inadmissible evidence, does not find

25   adequate support in the comparable sales that he considered and will be excluded.

26       **E.    Fundamental Errors in the Landowners' Appraisal**

27       Mr. Sanders' disregard of relevant sales and misuse of remote, inadmissible sales

28   disguise the fundamental errors in his appraisal.  He relies on sales and uses that are

1  materially different in location, character, and time to conclude that light industrial or similar

2  higher use was likely in the reasonably near future for the subject property.  That conclusion

3  lacks foundation and is the product of circular reasoning.  He compounds these errors by

4  assuming that the market values of light industrial properties in the Curtis Industrial Park and

5  other areas of Yuma reflect a fixed land value for light industrial uses in the subject

6  neighborhood.  In fact, light industrial users in this neighborhood, unlike those in most of Mr.

7  Sanders' sales, had a great oversupply of agricultural land suitable for conversion.  The

8  comparatively lower trading value of land along the south side of County 14th Street reflects

9  the competition among sellers for few such immediate users.  Mr. Sanders has shown, at

10  most, that the subject property is physically adaptable to light industrial or retail use.  His

11  sales data do not show a reasonably probable demand for that use, which would be reflected

12  not in remote transactions but rather in actual sales in the subject neighborhood.

13      The law's primary reliance on comparable sales when such sales exist is vindicated

14  in this case.   The jury may consider a proposed use only if there was or was likely to be a

15  market for that use at the time of the taking or at a reasonably proximate date thereafter.  Ms.

16  Johnson studied the subject neighborhood and concluded that the  highest and best use of the

17  land is "investment." (Johnson App. 4.)  Market data from the subject neighborhood at the

18  time of the taking did not suggest demand for the use contemplated by the landowners: light

19  retail and warehousing.  Mr. Sanders used remote land sales in an attempt to prove that, but

20  for the project, portions of the subject property would likely have been converted to that

21  ultimate and more profitable use. This is the gravamen of  the Government's second Motion

22  in Limine.

23  **IV.    Motion to Exclude Evidence of Project Influence**

24      The United States urges exclusion of "any evidence of pre-condemnation activities,

25  including any announcements or pre-decisional discussions concerning the project to expand

26  the [Air Base], that [Defendants] allege affected the value of their property."  (Doc. # 58 at

27  1.)  The flaw in the landowners' appraisal does not lie, however, in its abstract discussion of

28  "project influence."  Evidence of project influence is at least relevant to the issue of just

compensation, and the Motion as written at an extremely high level of generality will be denied. However, the Motion is well founded to the extent that it challenges the foundation for Mr. Sanders' failure to consider, on project influence grounds, genuine comparable sales across the street and outside the project area.

### A.    The Doctrine of Condemnation Blight is Potentially Applicable

Mr. Sanders' invocation of project influence as a substitute for market demand is not supported by admissible evidence. But the United States contends that, assuming that the proposed air base expansion actually depressed demand for retail and light industrial property by diverting potential buyers to areas other than the subject neighborhood, any fluctuation in market value caused by the announcement of the project itself is simply an "incident of property ownership" and not compensable in a federal condemnation proceeding. (Doc. # 65 at 3.) This argument is without merit.

### 1.    *Reservation Eleven* Does Not Apply

The Government's argument rests primarily upon *Reservation Eleven Assocs. v. Dist. of Columbia*, 420 F.2d 153, 157-58 (D.C. Cir. 1969), in which Judge Leventhal observed that the "[t]he announcement or even internal consideration of general government planning," even when it has an "adverse effect" on land value, is "not a taking in the constitutional sense," but rather an "incident of ownership." (citing *Danforth v. United States*, 308 U.S. 271 (1939)). Plaintiff's reliance upon *Reservation Eleven* is misplaced.

The landowners in *Reservation Eleven* sought to introduce evidence relating to the premium a hypothetical purchaser would have paid for condemned property if the District of Columbia had closed several government-owned alleys, creating a single and more valuable parcel of land. Judge Leventhal excluded the proffered evidence of highest and best use as overly speculative. A willing buyer would not have paid the premium for the "likelihood of the closing of the alleys" because the District had in fact twice rejected the landowners' applications for alley closure prior to the taking. *Id*. at 157. It would also have been error for the trial judge to instruct the jury to ascertain the market value of the property as if the alleys, which cut the subject property into five smaller sections, actually had been

closed.  Compensation for the premium was not warranted as a matter of law because the landowners failed to prove that the government's decision not to close the alleys was directly related to the taking of the entire parcel for a public works project at a later date.  The failure to close was attributed instead to "long-standing amorphous ever-changing [freeway construction] plans which might involve the particular property at some indefinite future time in some indefinite future way."  *Id*. at 156.  The discretionary decision not to close the alleys was not a constitutional taking, but merely a withholding of a governmental privilege.  No compensation could be made for the adverse effects of general government planning in an eminent domain proceeding absent proof of causation.

The landowners in this case do not, like the landowner in the District of Columbia case, contend that the announcement of the project amounted to a de facto taking.  (Doc. # 62 at 2.)  Nor do Defendants seek consequential damages from the lawful taking that occurred on January 31, 2005, such as a speculative lost business profits, which are never chargeable to the United States in condemnation proceedings.  (*Id*.); *Tenn. Valley Auth.*, 319 U.S. at 282.  What the landowners ask for is the opportunity to present evidence to the jury relating to the value the property would have had at the time of the taking if the government had never begun the process of condemning the land, including planning and publicizing the condemnation.

### 2.    The Doctrine of Condemnation Blight

"In condemnation of large tracts of land for major public works, it is rare that the sovereign moves with speed or stealth."  *United States v. 8,968.06 Acres of Land*, 326 F.Supp. 546, 548-49 (S.D.Tex. 1971).  In this case, the United States was required by the National Environmental Policy Act, 42 U.S.C. § 4321, *et seq*, to announce the proposed expansion of the Marine Corps Air Station several years prior to the taking.  (Doc. # 58 at 4.)  It would be unfair, contends Plaintiff, to penalize the United States for following the law when the announcement of the project had the unintended effect of depressing market values for industrial properties within the affected neighborhood.

The usual rule is that the Government must pay the market value at the moment it actually takes title from the owner.  An impending condemnation can distort the market by artificially inflating or depressing land values.  *Reynolds*, 397 U.S. at 15-16.  A more realistic valuation of condemned property as of the date of the taking is achieved by excluding the fact of condemnation itself from the compensation calculus.  *United States v. Va. Elec. Power Co.*, 365 U.S. 624, 636 ("[I]t would be manifestly unjust to permit a public authority to depreciate property values by a threat of the construction of a government project and then to take advantage of this depression in the price which it must pay for the property when eventually condemned.") (internal quotation and citation omitted); Nichols, § 12B.17 (discussing the doctrine of "condemnation blight").  *Reservation Eleven* held that compensation for precondemnation activities is appropriate only if the resulting change in market value was probably caused by the taking itself.  420 F.2d at 157.  Computing market value as if there were no proceedings to eliminate that market ensures that the United States neither pays an inflated price created by its own condemnation, nor profits indirectly from the depreciative effect of its own initiative.  *8,968.06 Acres of Land*, 326 F.Supp. at 549; *see City of Buffalo v. J.W. Clement Co.*, 28 N.Y.2d 241. 255, 269 N.E.2d 895, 903 (1971) (when "condemnation blight" reduces the value of the later condemned property, "compensation shall be based on the value of the property at the time of taking, as if it had not been subjected to the debilitating effect of a threatened condemnation").

The doctrine of condemnation blight recognizes that "fair" market value cannot be assessed as of the date of the taking if project planning and publicity artificially depressed demand prior to the transfer of title.  The imminence of the Government's taking must be totally disregarded.  The precondemnation announcement of the Air Base expansion was, by the Government's own admission, an integral and legally necessary part of its eminent domain procedure.  The Fifth Amendment requires the Government to make Defendants whole; they are entitled to no more, and they deserve nothing less.  *Olson*, 292 U.S. at 255 (the Just Compensation Clause requires that Defendants be "put in as good a position pecuniarily as if [their] property had not been taken").  To be "made whole," the dispossessed

landowners must logically be compensated for the decline in property value that they prove to be caused solely by the taking.

**B.    Project Influence Does Not Justify Exclusion of Comparable Sales Across the Street**

Mr. Sanders does err by excluding, on project influence grounds, comparable sales located directly across the street from the subject property.  The appraiser submits that project influence necessitated recourse to geographically and temporally remote land sales, but he does not show that the Air Base expansion actually distorted the market for light industrial properties beyond the project's boundaries, which have been fixed since 1999. Demand for a proposed use may not be proven by inference from properties remote from the subject neighborhood when there are adequate comparable sales, including some directly across the street.

The appraisers agree that "the land within the acquisition area [north of County 14th Street between Avenues 3E and A] is impacted by the project." (Johnson App. 15.)   Both Ms. Johnson and Mr. Sanders expressly excluded sales from within the project area in their respective appraisals for this reason.  (*Id*. at 15; Sanders App. 15.).  In Ms. Johnson's opinion, "[t]here is no apparent reason why the land outside the acquisition area would be impacted by the project" and notes six roughly contemporaneous sales of similarly sized lots in the vicinity of the subject land but outside the project area. (Johnson App. 15, 34-36.)

The landowners' appraiser, in contrast, disregards all those comparable sales, without sufficient reason to conclude that the area immediately across the street from the subject property remained only lightly developed for any reason not related to normal market forces.

**V.    Motion to Exclude Valuation by Use of Lot Method**

The bulk of Mr. Sanders' appraisal will be excluded because it is premised on dissimilar rather than comparable sales, and proposes a highest and best use founded on speculative assumptions of "project influence" rather than empirical evidence of market demand.  But the United States objects to a third and final flaw in the landowners' appraisal. The Government urges exclusion of "the lot method by which the landowners . . . have

1   valued the subject property as separate lots and added those values together to reach their

2   estimate of fair market value." (Doc. # 59 at 1.) This Motion will also be granted. Even if

3   an inference of reasonably proximate demand for all of Mr. Sanders' proposed uses were

4   justified, which it is not, his $1,023,000 estimate would be excluded because it purports to

5   value the entire 10.082 acre lot by adding the prices its paper subdivision lots might bring

6   on the retail market. This is error, for the United States did not acquire five separate two-acre

7   parcels of land being put to three distinct uses on January 31, 2005. The sovereign took

8   10.082 acres of partially improved, agricultural land held by one owner and subdivided on

9   paper, with the *potential* to be put to different optimal uses in the reasonably near future. For

10  the limited purposes of this discussion, the court will overlook the evidentiary shortcomings

11  discussed above and assume that each of Mr. Sanders' proposed uses are supported by

12  competent evidence of market demand.

13      **A.    Mr. Sanders' Methodology**

14      A brief discussion of Mr. Sanders' valuation methodology is warranted. After

15  comparing the two frontage sites on the subject property to two allegedly similar lots, Mr.

16  Sanders surmised that Parcels B and E may be valued at $120,000 per acre, an estimate that

17  resulted in a market valuation of $165,000 for Parcel B, and $180,000 for Parcel E. (Sanders

18  App. 44-45). Mr. Sanders next concluded, by reference to allegedly comparable sales from

19  the Curtis Industrial Park, that landlocked Parcels A, C and D were each worth $150,000 as

20  of the valuation date. (*Id*. at 43-44.). Finally, the landowners' expert used the replacement

21  cost approach to estimate the value of the improvements on Parcel A at $228,000. (*Id*. at 32-

22  38.) Mr. Sanders added these estimates together and concluded that the market value of the

23  10.082 acres of land as of January 31, 2005, was $1,023,000. (*Id*. at 45.)

24      It is clear from the foregoing that the appraiser did not estimate the value of the entire

25  lot by considering how "the prospect of demand for . . . [each parcel's highest and best] use

26  affects the market value while the property is privately held" by a single owner on the

27  valuation date. *Olson*, 292 U.S. at 255. Rather, Mr. Sanders calculated the measure of value

28  by determining what the five individual lots could bring on the retail market when actually

1   sold to distinct highest and best *users*, and then adding those figures together.  *Id*.  Mr.

2   Sanders' estimate of market value does not adequately account for such factors as the

3   difficulty inherent in finding buyers for each of the five parcels, which are not immediately

4   distinguishable from other agricultural properties in the subject neighborhood, the difference

5   between the present and deferred receipt of the purchase price of the lots, and the cost to the

6   buyers of the unimproved lot of installing utilities.  Even if the appraiser had utilized the

7   appropriate discount factors, which he did not, resort to the "lot method" of land valuation

8   is inappropriate where, as here, evidence of comparable sales of similarly sized lots is

9   available.  *99.66 Acres of Land*, 970 F.2d at 655.  The landowners expressly disavow any

10  reliance upon this disfavored valuation methodology, as they must, and they may not by any

11  subterfuge smuggle individual lot valuations to the jury under the rubric of "non-

12  homogenous highest and best uses," the "cost approach" or any other methodology.  (Doc.

13  # 60 at 4; Sanders App. 50.)

14          **B.      The Landowners Must Value the Entire Tract**

15          As summarized in a leading treatise, "The accepted rule for the evaluation of [raw]

16  land, therefore, is that the land will be considered in its present condition as a whole, with

17  consideration given to any increment or enhancement in value due to property's present

18  adaptability to . . . development." Nichols, § 12b.14 (citing cases).  "The test is not what the

19  [individual] lots will bring when and if . . . willing buyers come along, but what the tract, as

20  a unit, and as is, platted or not, and in whatever state of completion, will bring from a willing

21  buyer of the whole tract."  *State v. Tedesco,* 4 Utah 2d 248, 251, 291 P.2d 1028, 1030 (1956).

22  The determiners of compensation in an eminent domain proceeding sit, in effect, as

23  hypothetical land speculators:

24          The jury are to value the tract of land and that only.  They are not to determine how
            it could best be divided into building lots, nor conjecture how fast they could be sold,
25          nor at what price per lot. A speculator or investor, in deciding what price he could
            afford to pay, would consider the chances and probabilities of the situation as then
26          actually existing. A jury should do the same thing. They are not to inquire what a
            speculator might be able to realize out of a resale in the future, but what a present
27          purchaser would be willing to pay for it in the condition it is now in . . . . They should
            have been told that they had nothing to do with the subdivision of this tract, the price
28          of the lots, or the probability of their sale; but that they were to ascertain the fair

selling value of the land [on the date of the taking], in order to determine the actual damage done to its owner.

*United States v. 3.544 Acres of Land*, 147 F.2d 596, 598 (3d Cir. 1945) (citation omitted).

### C.    *City of Phoenix* is Inapposite

The case cited by Defendants in support of their expert's appraisal methodology, *City of Phoenix v. Wilson*, 200 Ariz. 2, 21 P.3d 388 (2001), arose under entirely different facts and its holding finds no purchase here. (Doc. # 60 at 5-6.) *Wilson* involved a partial taking of 1.4 acres of urban land that, according to the landowner's appraiser, had a significantly higher optimal use than the 23 acre lot from which it was severed. The Arizona Supreme Court, emphasizing the flexibility inherent in the term "market value," permitted the landowners to be adduce evidence as to the estimated market value of the 1.4 acres of highly saleable land that were actually taken from them. Application of the traditional "whole parcel" rule of valuation as set forth above would have worked an injustice upon the condemnee by depriving him of the value that probably inhered in that small section of the larger tract. There is no risk of injustice here. The landowners will be compensated by the jury for what they actually lost: 10.082 acres of land, subdivided into five lots by a land plat, each parcel having some potential to be sold to a different buyer for its particular highest and best use at some future date. To permit the jury to hear Mr. Sanders' conclusions as to the price each parcel might have fetched if sold to a retail buyer for its optimal use as of the valuation date would be to compensate the landowners for what they *wished* they had lost, an entirely speculative windfall measure of damages that finds no support in the applicable law.

### D.    Value of Entire Parcel Admissible to a Land Speculator

The Government moves more generally to exclude all "evidence of value . . . by which the landowners . . . have valued the subject property as separate lots." (Doc. # 59 at 1.) This too is error. While the jury may not set compensation by determining the simple mathematical total of the individual lot values as sold to different purchasers for their optimal use, it is entitled to hear evidence as to the value of the entire parcel as viewed by a land

speculator purchasing the property with an eye toward future subdivision and resale. Assuming a sufficient pretrial showing of demand, evidence of sales of two-acre lots occurring in the vicinity of the subject property at around the time of the taking for the highest use proposed by the landowners is admissible as an indicator of the value of the undeveloped acreage to that hypothetical purchaser. "Certainly the price a promoter would pay for undeveloped land suitable for subdivision would be influenced by the price he would expect to get per lot after subdivision." *United States v. Iriarte*, 166 F.2d 800, 804 (1st Cir. 1948) (but noting that it would be "patent error" to value the land by "simply multiplying the number of square meters in it by the average price per square meter at which" neighboring lots were sold); *158.24 Acres of Land*, 696 F.2d at 559 (same); Nichols, § 21.02 ("Although sales may not be comparable for the purpose of establishing value, they may, nevertheless, be admissible on a limited basis, for the purpose of proving highest and best use, and such non-comparables may be used to show a trend in values."). Such transactions are without question "facts which would influence a person of ordinary prudence, desiring to purchase the property," and are therefore admissible for the purpose of evaluating the highest and best use of the entire tract. *100 Acres of Land*, 468 F.2d at 1267.

Consistent with the wisdom of *Olson*, in which it was held that, "[j]ust compensation includes *all elements* of value that inhere in the property," the determiners of compensation must consider all of the property's reasonably probable highest and best uses as they may enhance the present value of the entire tract of condemned land on the date of the taking. 292 U.S. at 266 (emphasis added). "It is clear that in condemnation proceedings if evidence shows a reasonable probability of adaptability of lands for specific uses, evidence regarding the *value* of the property for such prospective uses should be received." *United States v. 1291.83 Acres of Land*, 411 F.2d 1081, 1087 (6th Cir. 1969) (emphasis added). It is therefore for the jury to "decide whether the property's suitability for such use enhances its market value and, if so, by how much." *320.0 Acres of Land,* 605 F.2d at 817; *United States v. Waterhouse*, 132 F.2d 699, 702 (9th Cir. 1943) (same). The point was made explicitly in a case arising under Ohio law on similar facts:

> Land which is . . . divided and presently suitable for sale as individual lots to many buyers would have a higher market value than land which is merely currently suitable for sale as one tract to a single person who would in turn subdivide or develop the land for sale to others . . . . Therefore, although the question for the jury is the fair market value of the tract as a whole, evidence as to the individual lot values [is] both pertinent and necessary to the consideration of the highest and best use of the land."

*In re Appropriation for Hwy. Purposes of Lands of Lunsford*, 15 Ohio App. 2d 131, 135, 239 N.E.2d 110, 114 (Ct. App. 1968).

### E.    Conclusion

Mr. Sanders may not value the condemned property by the sum of the premiums each paper subdivision might command when sold on the retail market for its optimum use. The minimal probative value of that testimony to the issue at hand–just compensation for the loss of 10.082 acres of predominantly agricultural land–is substantially outweighed by the very real danger of confusion of the issues and prejudice. Fed. R. Evid. 403. Assuming that each proposed use is justified by a showing of reasonably proximate demand, Mr. Sanders may testify only as to what a single purchaser would be willing to pay for the entire tract of land in its condition as of the date of the taking, with due consideration given to sales of comparable two-acre lots in the nearby area around the time of the taking. These transactions would be admissible only to the extent that they might enhance the price a speculator would pay for the entirety of the unimproved land on January 31, 2005.

IT IS THEREFORE ORDERED that Plaintiff's Motion In Limine to Exclude Sales and Listings After the Date of Valuation (Doc. # 57) is granted. Defendants' appraisal may include sales of comparable properties in the subject neighborhood through June 2005. Geographically remote and otherwise dissimilar will be excluded. Data from the Curtis Industrial Park and the Tucson area are admissible to prove depreciation and for no other purpose.

IT IS FURTHER ORDERED that Plaintiff's Motion in Limine to Exclude Evidence of Project Influence (Doc. # 58) is denied as written. The Motion is granted to the extent that it challenges Mr. Sanders' conclusion that project influence justifies exclusion of genuine comparable sales outside the project area.

1    IT IS FURTHER ORDERED that Plaintiff's Motion in Limine to Exclude Valuation

2   by Use of Lot Method (Doc. # 59) is granted.  Defendants' appraiser must value the 10.082

3   acres of land as a single parcel as of January 31, 2005.

4    IT IS FURTHER ORDERED that, in light of the proximity of the April 17, 2007 trial

5   date and in the event the landowners wish to offer a revised expert opinion of valuation, the

6   court will entertain a motion for a trial continuance to the first two weeks of May, which is

7   available subject to priority of a scheduled criminal trial that may settle.

8    DATED this 27th day of March 2007.

9

10   _____

11   Neil V. Wake
    United States District Judge

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28